GLORIA HULL, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; BILLY HULL, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hull v. Commissioner
Docket Nos. 2691-78, 2692-78.
United States Tax Court
T.C. Memo 1986-112; 1986 Tax Ct. Memo LEXIS 489; 51 T.C.M. (CCH) 663; T.C.M. (RIA) 86112; March 24, 1986. H. Wayne Grant, for the petitioners. John L. Hopkins, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax in the amounts of $17,329.57, $27,784.23 and $4,922.83 for the taxable years 1968, 1969 and 1970, respectively, and additions to tax under section 6653(b) [1] in the amounts of $8,664.79, $14,611.72 and $2,461.42 for these respective years. By order entered September 30, 1982, this Court granted respondent's motion for partial summary judgment and determined that each of petitioners is collaterally estopped from denying liability for the additions to tax under section 6653(b) for the taxable years 1968 and 1969 by reason of being convicted for willfully and knowingly attempting to evade *490 and defeat income taxes for these years in violation of section 7201. Respondent on brief has conceded that there is no addition to tax for fraud for the year 1970 and that the return for that year was not false and fraudulent. Respondent further concedes that by reason of this concession the statute of limitations bars the assessment and collection of any tax for the year 1970. By reason of the order of this Court granting respondent's motion for partial summary judgment and respondent's concession as to the year 1970, the only issue remaining for decision is the amount by which petitioners understated their taxable income for each of the years 1968 and 1969. FINDINGS OF FACT Petitioners, husband and wife during the years 1968 and 1969, filed joint Federal income tax returns for these years with the Director, Southeast Service Center, Chamblee, Georgia. At the time of the filing of her petition in this case, Gloria Hul 1 resided in Rossville, Georgia, and at the time of the filing of his petition in this case, Billy Hull *491 resided at Deberry Correctional Institute, Nashville, Tennessee. Petitioners were married in 1951 while they were juniors in high school. During their senior year in high school, Gloria Hull worked on the second shift at Chattanooga Glass Company as well as attending school. When they finished high school, Billy Hull worked at the Peerless Woolen Mills for a year or two until he entered college in 1953 or 1954 at Tennessee Tech in Cookeville, Tennessee. While Billy Hull attended Tennessee Tech, Gloria Hull continued to work. She was employed at Airland Carpet Mill during the first years he was in college and later moved to Cookeville where she worked for the telephone company. Billy Hull graduated from Tennessee Tech in 1958 or 1959 and moved back to Rossville, Georgia, where he went to work at Muller Company, a foundry, as a sand lab technician. Gloria Hull did not work for approximately 1-1/2 to 2 years beginning in 1958 at the time of the birth of her first child. She returned to work at Riviara Carpet Mill where she continued to work until sometime in 1962 and then ceased working for 2 years after the birth of her younger child. Thereafter, she went to work at Concrete *492 Forms. Prior to and during the time Billy Hull was working for Muller Company, he from time to time worked at gymnasiums or spas. In 1967, Billy Hull began operation of a go-go club. He continued to work at Muller Company for approximately 6 months after opening this club but later ceased to work at Muller Company and devoted his full time to the club except for working from time to time at two gymnasiums.The go-go club consisted of a room known as the Lion's Den and another one known as the Castaways. After Billy Hull began operation of the go-go club, Gloria Hull began to work there in the evenings and after approximately 6 months she left her employment with Concrete Forms and began to work full-time at the go-go club. She worked as the evening cashier and did such things as filling cigarette machines during the day as well as keeping the club's books. Billy Hull's mother, who was living at the time of the trial of this case, was the daughter of Katie Holcomb. Katie Holcomb was a bootlegger. She purchased bootleg whiskey and sold it from her home. Billy Hull helped his grandmother in her bootleg business. He would help her bury whiskey at night and at times he would dig *493 holes for her in which to put a barrel to fill with whiskey that would be left there for approximately a year to char. He would also watch at night for his grandmother for the man who brought whiskey to her to come by, and at times he would help her count money which she had taken in from the sale of whiskey. Katie Holcomb dealt in cash in her business. From time to time, Katie Holcomb gave presents to Billy Hull, Gloria Hull and their children. She gave them such items as automobiles and a boat, as well as clothes. She also from time to time paid bills for them including the cost of sending Billy Hull to college. When the Hull's older son was born in 1958, Katie Holcomb paid the hospital bills. She also paid other medical and hospital bills for Billy and Gloria Hull. In addition to her daughter, Billy Hull's mother, Mrs. Holcomb had an adopted son, Richard Holcomb. Richard Holcomb and his wife lived in the house with Katie Holcomb. Richard Holcomb also assisted his mother, Katie Holcomb, with her bootleg business. Approximately 14 months prior to her death on February 20, 1969, Katie Holcomb began to show signs of forgetfulness from hardening of the arteries. At approximately *494 this time she was arrested and her son, Richard Holcomb, took over the running of her bootleg whiskey business. After Katie Holcomb was arrested, her mind started to deteriorate. Richard Holcomb would handle obtaining the whiskey, selling the whiskey and taking payment for it, but he would give the money he received for the whiskey to his mother, Katie Holcomb. Richard Holcomb would help his mother count the money. Katie Holcomb gave presents to her son Richard. She gave him an automobile and she paid for a number of trips for Richard Holcomb and Billy Hull to Florida. Sometimes they would go to Florida as often as twice a month. In addition to seeing Mrs. Holcomb pay for trips for Billy Hull, Richard Holcomb on one occasion saw Katie Holcomb give money to Billy Hull, but he did not know the amount she gave him. Katie Holcomb was generous with her friends.She had a friend of longstanding, Emily Curd, who on a number of occasions went on trips with Katie Holcomb. Mrs. Curd lived within three blocks of Mrs. Holcomb for a number of years. Katie Holcomb paid all of the expenses for Mrs. Curd when Mrs. Curd accompanied her on trips to Cuba and to the Bahamas and similar places. *495 She would buy clothes for Mrs. Curd to take on these trips. Mrs. Curd would be given cash by Mrs. Holcomb to purchase clothes and to purchase the plane tickets and the boat tickets. Mrs. Holcomb would carry large quantities of cash with her on the trips on which Mrs. Curd accompanied her but Mrs. Curd did not know the amount of cash she had with her. Mrs. Curd would see Mrs. Holcomb tip lavishly on the trips they went on and she would participate with Mrs. Holcomb in playing bingo or engaging in other forms of gambling while on these trips. Mrs. Holcomb often spoke fondly of Billy Hull to Mrs. Curd and would discuss with Mrs. Curd presents she planned to give Billy Hull, such as an antique automobile. Mrs. Curd never saw Mrs. Holcomb give Billy Hull any money. Mrs. Curd observed Mrs. Holcomb during their trips put items away and not be able to remember where she had put them. At times, she would see Mrs. Holcomb hide money in their hotel room and be unable to remember where she had put the money. She also observed Mrs. Holcomb spend money and then be unable to remember for what she had spent the money. Approximately a month or a month and a half before her death, Mrs. Holcomb *496 had been in the hospital but had returned to her home. Katie Holcomb died on February 20, 1969. The day before she died, she was rushed to the hospital. Billy Hull thought that the reason for her hospitalization was that a blood vessel had burst in her head. The day following Mrs. Holcomb's hospitalization, the entire family was called to come to the hospital. Billy Hull, his two sisters, Richard Holcomb and Billy Hull's mother were there at the time Mrs. Holcomb died. Billy Hull pleaded guilty to charges of income tax evasion for the years 1968 and 1969 and Gloria Hull pleaded guilty to aiding and abetting Billy Hull in the evasion of income tax for these years. Billy Hull later pleaded guilty to the charge of accessory before the fact of murder in the first degree. Without consideration to any cash, aside from cash in banks, which Billy and Gloria Hull might have had, the folowing schedule shows their assets and liabilities as of December 31, 1967, 1968 and 1969, with the resulting increase in net worth for the years 1968 and 1969: 12/31/67
12/31/68
12/31/69
ASSETS
Cash in bank
$ 3,745.10
$ 5,703.28
$ 66,374.63
Automobiles
8,808.54
8,808.54
8,915.39
Corporate stock
7,012.50
Real estate
8,316.59
112,150.44
84,917.04
Receivables
Business assets
1,378.30
14,158.17
24,500.74
Prepaid interest
12.75
465.40
885.76
Total Assets
$22,261.28
$141,285.83
$192,606.06
LIABILITIES AND
DEPRECIATION RESERVE
Depreciation reserve
$ 86.14
$ 416.96
$ 4,041.45
Outstanding checks
1,266.10
997.23
551.67
Loans (unpaid balances)
7,707.60
72,320.73
43,710.91
Capital outlay payables
6,163.12
310.53
Total Liabilities and
Depreciation Reserve
$ 9,059.84
$ 79,898.04
$ 48,614.56
NET WORTH
$13,201.44
$ 61,387.79
$143,991.50
Increase in net worth
$ 48,186.35
$ 82,603.71
*497 The following schedule shows the computation of petitioners' understatement of taxable income for each of the years 1968 and 1969 based upon the above set forth increases in net worth in each of these years, adding thereto petitioners' personal living expenses, subtracting therefrom an insurance recovery and capital gains deduction, and making appropriate adjustments for itemized deductions, personal exemptions and taxable income as reported on petitioners' joint returns: EXPLANATION
1968
1969
Increase in net worth
$48,186.35
$82,603.71
Plus: Personal living expenses
9,695.00
15,910.37
Less: Insurance recovery
7,200.00
Capital gains deduction
17,922.20
Adjusted gross income
$57,881.35
$73,391.88
Less: Itemized deductions
2,369.78
2,876.19
Personal exemptions
2,400.00
2,400.00
Corrected taxable income
$53,111.57
$68,115.69
Less: Taxable income per
joint return
9,749.64
6,850.48
Understatement of taxable income
$43,361.93
$61,265.21
Respondent explained the adjustments he made in the notice of deficiency by stating that in the absence of adequate records petitioners' taxable income had been computed upon the basis of the increases *498 in net worth during the years 1968 and 1969, with adjustment for nontaxable items of income and for personal and other nondeductible amounts. Petitioners do not question the assets and liabilities as determined by respondent and as set forth above or the computed amounts of their personal living expenses or the nontaxable items as determined by respondent in the notice of deficiency. It is petitioners' contention that Billy Hull had cash in a safe deposit box of approximately $35,000 at the end of 1967 which he spent during 1968 and 1969 and that approximately 3 weeks after his grandmother's death on February 20, 1969, in accordance with information she had furnished him on her deathbed, he dug up two glass containers in her yard that contained somewhere around $40,000 or $50,000 which he spent in 1969. It is petitioners' position that proper credit for these amounts of cash have not been allowed in the net worth computation as made by respondent in the notice of deficiency. OPINION The issue here is purely factual. Respondent, finding that petitioners' records were inadequate for computation of their taxable income, computed their income for each of the years here in issue *499 on the net worth basis. It is well settled that where a taxpayer'x records are inadequate to compute his taxable income, respondent may reconstruct income by any appropriate method, including the net worth method. . Respondent's determination of petitioners' income is presumptively correct and petitioners have the burden of showing error therein. . Rule 142, Rules of Practice and Procedure of the United States Tax Court. Petitioners stipulated with respondent the assets and liabilities which they had at the end of each of the years 1967, 1968 and 1969, reserving only the right to contend that in addition to those assets and liabilities they had cash which was not considered by respondent. Petitioners made no effort to show any error in respondent's determination of their personal living expenses or nontaxable receipts. Therefore, the issue in this case is only whether petitioners have established that they had cash at December 31, 1967, not included by respondent in the net worth computation and that this cash was used in the acquisition of the assets which they *500 acquired in 1968 and 1969 and that they acquired cash in 1969 from a nontaxable source. Mrs. Hull testified that Billy Hull carried some cash on his person at all times but she did not know how much.There is nothing in the record to indicate that the amounts of cash carried by Billy Hull on his person would not have been the same or approximately the same at the end of each of the years 1967, 1968 and 1969. In fact, Mrs. Hull's testimony indicates that they were since she referred to his always carrying amounts of cash. The factual issue to be determined is the claim of Billy Hull that he had accumulated in a safe deposit box as of the end of 1967 approximately $35,000 in cash which be spent in the succeeding 2 years and that after his grandmother's death, in accordance with her deathbed instructions of where to look, he found between $40,000 and $50,000 of buried cash. The record shows by the testimony of persons other than Billy Hull that his grandmother, Mrs. Holcomb, gave him presents of clothes, automobiles, a boat, and trips to Florida. Mrs. Hull testified that Mrs. Holcomb gave petitioners a house trailer in which to live and later a home near hers and paid some bills *501 for her and her children. However, there is no evidence in the record that any large gifts of money were made by Mrs. Holcomb to Billy Hull aside from the testimony of Billy Hull. There is testimony by Richard Holcomb that on one occasion he saw his grandmother give Billy Hull some money which he thought to be between $200 and $500, but was not certain of the amount. Billy Hull testified that on numerous occasions his grandmother gave him between $200 and $500 and that he would spend some of the money and take the balance and put it in cash with money he saved from his earnings in a safe deposit box. He testified that by the end of 1967 the amount of cash he had put in this box had accumulated to approximately $35,000. We do not believe this testimony. The record shows that Mr. and Mrs. Hull worked in jobs which would not result in high compensation. [2] They had two children and, when each of these children was born, Mrs. Hull stayed off from work for approximately 2 years. The record shows that Billy Hull did not begin to work until about 1959 or 1960 and then worked primarily as a lab technician doing some extra work in connection with a recreational facility or gymnasium. *502 Mrs. Hull, when she was working, was doing clerical work in a small community, Rossville, Georgia. It is inherently incredible that Mr. Hull could have saved $35,000 from any earnings he had plus any relatively small amounts that his grandmother might have given him in cash. Also, it is incredible that if Mr. Hull was saving money in this manner, he would not have put the money in a bank account to draw interest. He did have bank accounts and the record shows he did have some interest-bearing bank accounts. He claimed he put the money in a safe deposit box but did not support this claim by any evidence of renting a safe deposit box or records showing any entry he made to a safe deposit box. There is no evidence in the record to support the testimony of Mr. Hull that he had a safe deposit box or had any accumulation of cash. The evidence in the record shows that Mr. Hull had a lifestyle that would belie a claim of saving *503 money on a relatively small salary. Mr. Holcomb, in his testimony, referred to the number of automobiles Billy Hull had and his interest in auto racing. Although there is testimony that Katie Holcomb gave Billy Hull the automobiles, he must have expended money to keep up these automobiles. On the basis of this record, we therefore conclude that there is no credible evidence in the record to show that petitioners had cash of $35,000 at December 31, 1967. The testimony given by Mr. Hull with respect to the $40,000 to $50,000 he dug up in his grandmother's yard is totally incredible. His explanation of how he obtained this money is the following: A * * * they rushed her to the hospital, then they called everybody in pretty quick and she was there, I'd say she was there one day and then the next day, that's when it happened, you know. * * * A We was all upset and my grandma, she died. I really don't know what--the vein busted in her head somehow or another. That's the reason she died. But she had--the doctors said she was having hardening of the arteries, and she was--one day she would be-- she'd know exactly what's happening, she was real smart, and then the next day, she'd *504 forget where she left things, and I think that was a problem. But they called us all in out there and they was in there working with her and we was out in the hall, and she called for me to come in, and I thought something was getting ready to happen, so I burst in there. They had tubes down her throat and oxygen, you know, in her arms and everything, and like to have scared me to death. And, so, she kept muttering for me to come there, and I went over there, and she said come down here close so you can hear me. So, I got down real close to her, and she kept saying I'm going to tell you where I've got everything I've got. I said no, Kate, you just don't worry about that right now, said you just worry about getting well, and she said no, I've got to tell you this. She whispered to me in my ear and told me, and then-- * * * A She told me, she said everything she had was buried. She told me where it was buried, and she said it's buried by the side of the house, in a little offset by the house that goes by the fence, and as you go in the house to unthaw the pipes in the winter time, there's a little thing right there and she said it's buried just as you go under, she said there's *505 two containers buried. She says they are buried about three feet under the ground, and she says you get those, and then, of course, I was upset. I was really upset she was telling me that, and I wanted to think about her, see. * * * A Then the doctor made me go back out and then about, I guess, 10 to 15 minutes or 20 minutes, she died. Q Did you check out what she had said? A Yes, I did. I didn't right off.I was upset about the thing. We went--I made arrangements for the people to bury my grandmother, and I really didn't think about it for awhile. I guess it was maybe three weeks or whatever, then I thought about it, then I went down and talked to Richard, and Richard was her adopted son, and she--you know, she didn't--Richard didn't have nothing. She didn't give Richard nothing. So, the house was in my name and her name, and, so, I give the house to Richard. I told Richard he could just have the house, and that's what happened. Q Did you look for the money? A No, I didn't then. But, I come back later, and then I went in the house to talk to Richard, and then when I come back out, I went out there and I found it. Q How much was it? A Well, I don't know that. *506 I don't even know how much it was. It was-- Q Where was it and how was it? A It was in two glass containers. The glass containers are still there, I guess, but they ain't got no money in them, but they are still there. And, the money was in little--in rubber bands and little packages, and both the glass containers was full. Q How big was the containers? A Oh, they was big like a gallon jug. Maybe a little bit bigger than a gallon jug, but they was full.Both of them was full. * * * Q Mr. Hull, how soon was it after grandmother died that you first went to the place that she told you the money could be found and located? A Two or three weeks, I guess. Q And, do you have idea how long it stayed in the ground until it was exhausted? A I have no idea. Q Was it a period of years, months? A I don't know. It was years and years and years. * * * Q Now, what was your reason for leaving the money in the ground? A Well, you just don't take it out. It's in a good, safe place. So, why would I take it out? Q Well, you had a safety deposit box, did you not? A Yes, I did. I had money in a safe deposit box. Q And, then, why didn't you take this money out of the *507 ground and put it in the safe deposit box? A Well, I sure would have to get a big safety deposit box. Q Weren't you concerned that somebody would find the money in the ground? A I was the only one that knew where it was at. Q The doctors and nurses were there, were they not, when your grandmother told you about it? A They couldn't have heard what she told me. I barely could understand what she was talking about. It is inherently unbelievable that a woman 10 or 15 minutes from death, apparently with a massive stroke, with doctors and nurses attending her could have given the lengthy explanation of where money was hidden that Mr. Hull testified Mrs. Holcomb gave to him. Furthermore, if Mrs. Holcomb had in fact been in physical condition in the last 10 or 15 minutes of her life to be able to talk with such lucidness to her grandson, certainly petitioners could have offered the testimony of the nurses and doctors or the hospital records to show that she was conscious and lucid immediately prior to her death. Furthermore, Mr. Hull made no explanation of why he considered Mrs. Holcomb's statement to him to mean for him to take the money and keep it as his own. When specifically *508 questioned, he stated that she never said she was giving him the money or for him to take the money for himself but merely told him where the money was. Apparently, from the record Mrs. Holcomb left no will. Mr. Hull's testimony was that there was no probate of any type of her estate. If Mr. Hull had found any of his grandmother's money he should have declared it as her estate and had it distributed to her heirs under Tennessee law. We do not believe Mr. Hull's testimony with respect to finding monies which were buried by his grandmothers. [3] From the testimony as to the physical condition of Katie Holcomb for sometime prior to her death, it is unlikely that she would have been able to bury two large glass containers of money or remember where she had buried them if she had. Even Mr. Hull's testimony is not that the amount of money he found buried was all spent in 1969. Obviously, evne if *509 Mr. Hull found and took some of his grandmother's money in 1969, this money could in no way affect the 1968 net worth computation. Mr. Hull's testimony was that he took years and years to spend the money, so the record does not show what effect any such cash funds could have had on the 1969 net worth computations. Mr. Hull has twice been convicted of felonies. By his own testimony he assisted his grandmother in an illegal activity of bootlegging.We do not believe his testimony with respect to the money he found or dug up after his grandmother's death. Since petitioners have totally failed to show error in respondent's determination for the years 1968 and 1969, we sustain that determination. Respondent has conceded that there is no deficiency for the year 1970. Accordingly, Decisions will be entered for the respondent with respect to the years 1968 and 1969 and for the petitioners with respect to the year 1970.
Footnotes
1. Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years here in issue.↩
2. Petitioners, who have the burden of proof, offered no evidence of the actual amount of their wages or salaries or of their expenses prior to the end of 1967 in support of Mr. Hull's claim that at the end of 1967 he had funds he saved from his compensation.↩
3. If we had believed Mr. Hull's testimony, we would not have concluded therefrom that the money was a gift to him but rather would have concluded that he appropriated for himself property of his grandmother's estate which should have been distributed to her heirs under Tennessee law.↩